IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | Criminal No. 1:20-MJ-264 |
| | ) | |
| SANAULLAH TARAR, | ) | |
| | ) | |
| *Defendant.* | ) | |

## AFFIDAVIT IN SUPPORT OF A
## CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Michael Y. Jeng, Special Agent, being duly sworn, hereby, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am employed as a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since June 2, 2017. Currently, I am assigned to a squad that investigates organized criminal enterprises and is based at the Washington Field Office – Northern Virginia Resident Agency in Manassas, Virginia. As a Special Agent, I am authorized to investigate violations of laws of the United States and am authorized to execute warrants issued under the authority of the United States. My duties with the FBI include, but are not limited to: the investigation of alleged violations of Federal criminal statutes which involve financial institutions; the investigation of complex financial crimes, including extensive document review, analysis and witness interviews; and the preparation, presentation and service of criminal complaints, arrest and search warrants.

2. This affidavit is based on my personal investigation and the investigation of others, including federal and local law enforcement officials whom I know to be reliable. The facts and information contained in this affidavit are based upon witness interviews and my review of

1

records, documents, and other physical evidence obtained during this investigation. This affidavit does not include each and every fact known to the government, but only those facts necessary to support a finding of probable cause to support the requested Criminal Complaint.

3. I make this affidavit in support of a Criminal Complaint charging SANAULLAH TARAR ("TARAR") with, from in or about 2018 to on or about January 20, 2020, in the Eastern District of Virginia, and elsewhere, knowingly and intentionally conspiring with Cooperating Defendant-1 ("CD-1"), Cooperating Defendant-2 ("CD-2"), Cooperating Defendant-3 ("CD-3"), Cooperating Defendant-4 ("CD-4"), and others, known and unknown, to defraud financial institutions, including CAPITAL ONE, BB&T, and NORTH AMERICAN BANCARD, contrary to Title 18, United States Code, Section 1344, and in violation of Title 18, United States Code, Section 1349.

**PROBABLE CAUSE**

**A. BACKGROUND OF THE INVESTIGATION**

4. CAPITAL ONE, BB&T, and NORTH AMERICAN BANCARD provide a range of traditional banking services throughout the United States, including in the Eastern District of Virginia, and are financial institutions within the meaning of Title 18, United States Code, Section 20, and within the scope of Title 18, United States Code, Section 1344.

5. On October 24, 2019, the FBI's Washington Field Office ("WFO") initiated an investigation into an organized criminal enterprise engaged in schemes to defraud various U.S. banks. WFO launched this investigation jointly with the Fairfax County Police Department ("FCPD"), U.S. Postal Inspection Service ("USPIS"), and Homeland Security Investigations ("HSI"). This investigation was initiated based on complaints from several banks, including

2

CAPITAL ONE and BB&T, regarding a scheme predicated on fraudulent returns that resulted in losses to the banks. Based on subsequent investigation as set forth in this affidavit, there is probable cause to believe that TARAR conspired with CD-1, CD-2, CD-3, CD-4, and others to defraud CAPITAL ONE, BB&T, and NORTH AMERICAN BANCARD (hereinafter referred to as the "financial institutions" or "the banks"), in violation of Title 18, United States Code, Section 1349.

**B.   THE SCHEME TO DEFRAUD**

6.   TARAR and his co-conspirators defrauded the financial institutions in the following manner:

   a.   First, TARAR and his co-conspirators incorporated businesses in the Commonwealth of Virginia and Maryland. A review of financial records and other documents associated with the incorporated businesses suggest that these businesses did not engage in legitimate commerce and were simply shell corporations created exclusively for TARAR and his co-conspirators to execute their criminal conspiracy.

   b.   Second, TARAR and his co-conspirators opened multiple business accounts for these shell corporations at CAPITAL ONE and BB&T, at various locations in the Eastern District of Virginia. As a result, the banks issued debit cards to the conspirators for each account. Because these were accounts purportedly associated with legitimate businesses, the accounts were opened with the ability to accept debit or credit card point-of-sales transactions, including the ability to deposit refunds or returns.

   c.   TARAR and his co-conspirators acquired point-of-sales terminals to be used to execute their conspiracy to defraud the financial institutions.

d.  Next, TARAR and his co-conspirators used point-of-sales terminals to deposit fraudulent refunds into the business accounts that had been opened at the banks. These refunds were fraudulent because they were not predicated on any legitimate previous purchase. In other words, the defendant and his associates falsely and fraudulently represented to CAPITAL ONE and BB&T that the funds being deposited into the business accounts were refunds or returns from prior transactions when, in fact, there were no prior transactions. They were worthless transactions between various shell companies created by TARAR and his co-conspirators for the sole purpose of defrauding the financial institutions. These fraudulent refunds would often be in large amounts, up to and including several thousands of dollars, and would sometimes include multiple refunds to the same business on the same day.

e.  Once the fraudulent refunds were processed, the banks would deposit money into the corresponding business accounts and make the refunded amount immediately available, as is standard within the banking industry. Shortly thereafter, TARAR and his co-conspirators would use their debit cards to withdraw cash at ATMs and local casinos, and to make purchases at various establishments with requests for hundreds of dollars in cash back. These transactions occurred in the Eastern District of Virginia and elsewhere. When no more funds could be withdrawn from the debit cards, TARAR and his co-conspirators would again use the point-of-sales terminals to issue another round of fraudulent refunds and repeat the process until the bank detected the fraud and closed the account. By the time the banks discovered that the returns were fraudulent, the banks had suffered a financial loss: the CAPITAL ONE loss totaled at least $169,732.39; and the BB&T loss totaled at least $459,730.27.

## C.  COOPERATING DEFENDANT-1 AND COOPERARING DEFENDANT-2.

7.  In or about September 2020, CD-1 and CD-2 pleaded guilty in the United States District Court for the Eastern District of Virginia to conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349. CD-1 and CD-2 pleaded guilty to being members of the conspiracy set forth in paragraph 6 above and are pending sentencing. CD-1 and CD-2 have met, along with their counsel, with the government and identified TARAR as a member and leader of the conspiracy. CD-1 and CD-2 are married and are cooperating with the government in the hopes of receiving a reduced sentence.

8.  Information CD-1 and CD-2 provided to the government includes, but is not limited to, the following:

   a.  CD-1 and CD-2 were recruited into the conspiracy by TARAR in or around 2018, and had participated in multiple schemes to defraud financial institutions, in addition to those that had defrauded CAPITAL ONE and BB&T, through January 20, 2020.

   b.  CD-1 and CD-2 stated that TARAR obtained point-of-sale machines to facilitate the schemes, which he operated in their presence on numerous occasions in order to defraud financial institutions.

   c.  CD-1 and CD-2 said that, initially, TARAR instructed them to use their existing business in connection with the fraudulent schemes; however, TARAR subsequently directed them to create additional business entities and to open financial accounts associated with these entities to conduct other fraudulent activity.

5

        d.      CD-1 and CD-2 told the government that they provided TARAR with the funds they obtained in connection with the conspiracy, and that TARAR would then provide them with a cut of the profit.

      9.      In addition to the fraudulent refund scheme against CAPITAL ONE and BB&T, CD-1 and CD-2 told law enforcement that TARAR also directed them, as well as other co-conspirators, to participate in a scheme in which credit card processing machines were used to authorize purchases of small amounts (oftentimes as low as $1 or $2) but with large tips (oftentimes in amounts of several thousands of dollars). Based on your affiant's training and experience, I know that it is standard in the banking industry for a credit card processing company to temporarily make available the full amount of a tip to a merchant once the transaction has been authorized by the purchaser, which is afforded by the card processing company in anticipation of being reimbursed by the purchaser's bank for the tip amount. Typically, reimbursement occurs within a few days. In this scheme, TARAR and his co-conspirators would leave large tip amounts from accounts that they knew would not have sufficient funds to reimburse the card processing company for the large tip amount. The tips would be made to merchant accounts associated with TARAR's co-conspirators. Once the transactions were made, TARAR would direct his co-conspirators to quickly withdraw the tip amounts from the merchant accounts before the card processing company would realize they were not going to receive reimbursement for the tip amount they had made temporarily available. As a result, the card processing companies suffered financial loss. According to CD-1 and CD-2, in connection with the above-described schemes and others, TARAR conspired with them to defraud multiple institutions from approximately 2018 to 2020.

10. Additionally, CD-1 and CD-2 stated that TARAR worked closely with at least two other co-conspirators to conduct these schemes, and identified two of these individuals from photos provided by law enforcement. CD-1 and CD-2 identified these individuals as Cooperating Defendant-3 ("CD-3") and Cooperating Defendant-4 ("CD-4"), and, as discussed further below in connection with a federal bank fraud case being prosecuted in the U.S. District Court for the District of New Jersey, these individuals as well as another co-defendant have independently corroborated information provided by CD-1 and CD-2 regarding TARAR's membership in the conspiracy to defraud financial institutions.

### D. COOPERATING DEFENDANT-3 AND COOPERATING DEFENDANT-4 (NEW JERSEY DEFENDANTS)

11. This investigation has been coordinated with other Federal districts, including the District of New Jersey. CD-3 and CD-4 were arrested by federal law enforcement pursuant to arrest warrants issued by the U.S. District Court for the District of New Jersey. The Criminal Complaint alleges CD-3 and CD-4 committed bank fraud, in violation of Title 18, United States Code, Section 1344. CD-3 and CD-4 have not yet pleaded guilty but have met, along with their counsel, with the government and identified TARAR as a member and leader of the same conspiracy. CD-3 and CD-4 are cooperating with the government in the hopes of receiving a reduced sentence.

12. CD-3 and CD-4 identified TARAR as the individual who directed them in executing various schemes to defraud financial institutions by utilizing card processing machines, shell companies, and shell company accounts. Additionally, CD-3 and CD-4 indicated that TARAR used two telephone numbers to communicate with them in furtherance of the conspiracy. As discussed further below, communications obtained post-arrest from CD-3's cell

7

phone corroborates the statements he/she made with regard to his/her association and criminal activities with TARAR. Further, these communications corroborate CD-1 and CD-2's statements regarding TARAR's scheme to defraud card processing companies.

13. Following the arrest of CD-3, agents reviewed CD-3's cellphone and discovered a series of WHATSAPP messages between CD-3 and TARAR. In one instance, TARAR sent CD-3 a screenshot of a bank account and the message, "Hhh limousine company. 9055 galvin lane Lorton va 22079. Iss act main deposit kerna hy 7k". CD-3 replied with, "Ok I just woke up Jee I don't think I can make to bank will do later" (see Exhibit 1). On or about November 22, 2019, CD-3 sent TARAR a message stating, "Deposit done" (see Exhibit 2). CD-3 subsequently explained to law enforcement that these WHATSAPP messages related to an instance where TARAR instructed CD-3 to deposit $7,000 into an account held in the name of HHH LIMOUSINE COMPANY.[1] According to CD-3, this $7,000 had been generated from a fraud scheme in which CD-3, TARAR, and other co-conspirators used a NORTH AMERICAN BANCARD card processing machine to authorize a purchase of a few dollars and added at least $7,000 in tips. NORTH AMERICAN BANCARD made the tip amount available for withdrawal while waiting for the purchaser's bank to reimburse it. TARAR and his co-conspirators had quickly withdrawn the $7,000 before NORTH AMERICAN BANCARD could realize that there would be no funds to reimburse them, thus causing this amount in financial loss to the card processing company. The transactions were fraudulent because the conspirators falsely represented to the card processing companies that the funds being tipped were based on legitimate transactions when, in fact, there

---

[1] A search of the Virginia's SCC showed that TARAR was the registered agent and director of a company by this name, and that it was associated with the address 9055 Galvin Lane, Lorton, VA 22079. The company was formed on or about March 15, 2019. CD-1 and CD-2 also informed law enforcement that TARAR resided at this address as well.

were no associated transactions and no actual funds intended to be provided to the merchant account; therefore, TARAR and his co-conspirators defrauded the card processing companies.

17033400131@s.whatsapp.net Chacha

**Attachments:**

Title: Hhh limousine company. 9055 galvin lane lorton va 22079 . Iss act main deposit kerna hy 7k.
Size: 82554
File name: d5f56061-6e39-464b-aa44-f5b02a3bf7d7.jpg
Path: https://mmg-fna.whatsapp.net/d/f/AkOOML-3giDf_jqvMPbjB8NQm-geScFPYk0bdUhwxeue.enc
d5f56061-6e39-464b-aa44-f5b02a3bf7d7.jpg

**Platform:** Mobile

11/16/2019 2:46:06 PM(UTC+0)

Source Extraction:
Legacy
Source Info:
8ffa5fa3b30eecfe69dd010a662dbf96678c57bc_files_partial-afu.zip/private/var/mobile/Containers/Shared/AppGroup/B52BC5E1-4A63-4340-B1A8-D5365412C575/ChatStorage.sqlite : 0x6CEC399 (Table: ZWAMESSAGE, ZWAGROUPMEMBER, ZWACHATSESSION, ZWAMEDIAITEM, Size: 155963392 bytes)
8ffa5fa3b30eecfe69dd010a662dbf96678c57bc_files_partial-afu.zip/private/var/mobile/Containers/Shared/AppGroup/B52BC5E1-4A63-4340-B1A8-D5365412C575/Message/Media/17033400131@s.whatsapp.net/d/5/d5f56061-6e39-464b-aa44-f5b02a3bf7d7.jpg : (Size: 82564 bytes)

[redacted]

Ok i just woke up Jee I don't think I can make to bank will do later

| Participant | Delivered | Read | Played |
| --- | --- | --- | --- |
| 17033400131@s.whatsapp.net Chacha | 11/16/2019 6:24:08 PM(UTC+0) | | |

**Status:** Sent
**Platform:** Mobile

11/16/2019 5:20:03 PM(UTC+0)

Source Extraction:
Legacy

Exhibit 1



Exhibit 2

### E. POTENTIAL FLIGHT FROM THE UNITED SATES

14. On or about September 13, 2020, approximately ten days after guilty pleas were entered by CD-1 and CD-2, law enforcement became aware that TARAR had purchased a one-way plane ticket to Pakistan, departing that evening from Dulles International Airport. According to information relayed by Customs and Border Patrol agents, TARAR went to the airport for his flight, but was unable to travel because he did not have documentation of a negative COVID-19 test.

15. On or about September 20, 2020, law enforcement became aware that TARAR had purchased another international airline ticket, departing that evening; however, TARAR subsequently voided the ticket on the afternoon of September 20, 2020 for unknown reasons.

16. On or about September 21, 2020, CD-1 informed law enforcement that CD-1 had spoken with a person identified as Individual-1, who is an associate of TARAR. CD-1 told law

10

enforcement that Individual-1 stated, in substance and in part, that TARAR was attempting to leave the United States because TARAR was aware of the arrests of CD-1, CD-2, CD-3, and CD-4. According to CD-1, Individual-1 stated that TARAR may travel across the U.S.-Canadian land border, potentially with false identification documents, and then take a flight from Canada to another country.

## CONCLUSION

17. Based on the information contained herein, I respectfully submit that there is probable cause to believe that from in or about 2018 to on or about January 20, 2020, in the Eastern District of Virginia and elsewhere, SANAULLAH TARAR did knowingly and intentionally conspire and agree with CD-1, CD-2, CD-3, CD-4, and others, known and unknown, to commit bank fraud contrary to Title 18, United States Code, Section 1344, and in violation of Title 18, United States Code, Section 1349.

Michael Y. Jeng
Special Agent
Federal Bureau of Investigation

Reviewed by: William Fitzpatrick, Assistant United States Attorney
Sara A. Hallmark, Special Assistant United States Attorney

Sworn to and subscribed in accordance with Fed. R. Crim. P. 4.1 by telephone on this 22nd day of September, 2020.

_____
The Honorable Michael S. Nachmanoff
United States Magistrate Judge

11